# EXHIBIT  D

COPY

1    BILL LOCKYER
     Attorney General
2    DAVID P. DRULINER
     Chief Assistant Attorney General
3    RONALD A. BASS
     Senior Assistant Attorney General
4    RENÉ A. CHACÓN
     Supervising Deputy Attorney General
5    BRUCE ORTEGA
     Deputy Attorney General
6    State Bar No. 131145
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-1335
8    Fax: (415) 703-1234

9    Attorneys for Respondent

10

11         IN THE UNITED STATES DISTRICT COURT

12      FOR THE NORTHERN DISTRICT OF CALIFORNIA

            SAN JOSE DIVISION

13

14    LUTHER JONES, JR.,

15                 Petitioner,      C 00-20600 JW (PR)

16      v.

17    LARRY SMALL, in his capacity as Warden of
     the Centinela State Prison, in Imperial,
18    California,

19               Respondent.

20

21

22

23    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE**
     **ANSWER TO THE ORDER TO SHOW CAUSE**

24           Hearing: None Requested

25

26

27

28

1

Table of Contents

2

Page

3

4   INTRODUCTION                                                                                  1

5   STATEMENT OF THE CASE                                                                          2

6   STATEMENT OF FACTS                                                                            4

7   STANDARD OF REVIEW                                                                            17

8   ARGUMENT                                                                                      19

9   PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS CORPUS
    RELIEF                                                                                        19

10

11          A.  The California Supreme Court Did Not Rule Contrary To Nor
                Unreasonably Apply Clearly Established United States Supreme
                Court Precedent In Rejecting Petitioner's Claim That He Was
12              The Victim Of Ineffective Assistance Of Appellate Counsel                          21

13          B.  The California Supreme Court Did Not Rule Contrary To Nor
                Unreasonably Apply Clearly Established United States Supreme
14              Court Precedent In Finding That Sufficient Evidence Supports
                The Sex Offense Convictions                                                        24

15

16          C.  The California Supreme Court Did Not Rule Contrary To Nor
                Unreasonably Apply Clearly Established United States Supreme
                Court Precedent In Finding That The Admission Into Evidence
17              At Petitioner's Second Trial Of His Testimony From The First
                Trial Did Not Violate Due Process                                                  27

18

19   CONCLUSION                                                                                   31

20

21

22

23

24

25

26

27

28

1

**Table of Authorities**

2

Page

3

Cases

4 *Butcher v. Marquez*
758 F.2d 373 (9th Cir. 1985)                                    29

5

*Delgado v. Lewis*
6 181 F.3d 1087 (9th Cir. 1999)
                                                              26
7 *Duhaime v. DuCharme*
200 F.3d 597 (9th Cir. 2000)                                   31

8
*Estelle v. McGuire*
9 502 U.S. 62, 112 S. Ct. 475,
116 L. Ed. 2d 385 (1991)                                   29, 30-31
10
*Grageda v. United States I.N.S.*
11 12 F.3d 919 (9th Cir. 1993)                                  23

12 *Gustave v. United States*
627 F.2d 901 (9th Cir. 1980)                                   21
13
*Hunter v. Aispuro*
14 982 F.2d 344 (9th Cir. 1992)                                 25

15 *Jackson v. Virginia*
443 U.S. 307, 99 S. Ct. 2781,
16 61 L. Ed. 2d 560 (1979)                                     22, 27

17 *Jeffries v. Blodgett*
5 F.3d 1180 (9th Cir. 1993)                                   29, 31
18
*Jones v. Barnes*
19 463 U.S. 745, 103 S. Ct. 3308,
77 L. Ed. 2d 987 (1983)                                      21, 23
20
*Lawson v. Kolender*
21 658 F.2d 1362 (9th Cir. 1981)                                23

22 *Lewis v. Delgado*
--- U.S. ---, 120 S. Ct. 1002,
23 145 L. Ed. 2d 296 (2000)                                      26

24 *Lincoln v. Sunn*
807 F.2d 805 (9th Cir. 1987)                                   29
25
*Lindh v. Murphy*
26 521 U.S. 320, 117 S. Ct. 2059,
138 L. Ed. 2d 481 (1997)                                      17
27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

## Table of Authorities, cont'd

*Miller v. Keeney*
882 F.2d 1428 (9th Cir. 1989)                                           21

*People v. Beamon*
8 Cal. 3d 625, 105 Cal. Rptr. 681,
504 P.2d 905 (1973)                                                      4

*People v. Bean*
46 Cal. 3d 919, 251 Cal. Rptr. 467,
760 P.2d 996 (1988)                                                     24

*People v. Ceja*
4 Cal. 4th 1134, 17 Cal. Rptr. 2d 375,
847 P.2d 55 (1993)                                                      24

*People v. Davis*
147 Cal. 346, 81 P. 718 (1905)                                          23

*People v. Eddahbi*
199 Cal. App. 3d 1135, 245 Cal. Rptr. 330 (1988)                         4

*People v. Harrison*
48 Cal. 3d 321, 256 Cal. Rptr. 401,
768 P.2d 1078 (1989)                                                     4

*People v. Johnson*
26 Cal. 3d 557, 162 Cal. Rptr. 431,
606 P.2d 738 (1980)                                                  24, 26

*People v. Leigh*
168 Cal. App. 3d 217, 214 Cal. Rptr. 61 (1985)                          25

*People v. Perez*
23 Cal. 3d 545, 153 Cal. Rptr. 40,
591 P.2d 63 (1979)                                                       4

*People v. Reed*
13 Cal. 4th 217, 52 Cal. Rptr. 2d 106,
904 P.2d 184 (1996)                                                     28

*People v. Scott*
21 Cal. 3d  284, 145 Cal. Rptr. 876 (1978)                              25

*Rose v. Lundy*
455 U.S. 509, 102 S. Ct. 1198,
71 L. Ed. 2d 379 (1982)                                                 22

*Ross v. Moffitt*
417 U.S. 600, 94 S. Ct. 2437,
41 L. Ed. 2d 341 (1974)                                                 23

*Satter v. Lapley*
977 F.2d 1259 (8th Cir. 1992)                                           22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO SHOW CAUSE (C 00-20600 JW (PR))

<u>Table of Authorities, cont'd</u>

*Shumate v. Newland*
75 F. Supp. 2d 1076 (N.D. Cal. 1999)                                    19

*Strickland v. Washington*
466 U.S. 668, 104 S. Ct. 2052,
80 L. Ed. 2d 674 (1984)                                               21, 23

*Tamapua v. Shimoda*
796 F.2d 261 (9th Cir. 1986)                                            22

*Van Tran v. Lindsey*
212 F.3d 1143, (9th Cir. 2000)                                          19

*Williams v. Taylor*
529 U.S ---, 120 S. Ct. 1495,
146 L. Ed. 2d 389 (2000)                              18, 21, 23, 25, 31

*Ylst v. Nunnemaker*
501 U.S. 797, 111 S. Ct. 2590,
115 L. Ed. 2d 706 (1991)                                               26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Table of Authorities, cont'd

1  **Constitutional Provisions**

2  United States Constitution
       Fourteenth Amendment                                         4, 22, 27, 29
3

4  **Statutes**

5  United States Code
       title 28, § 2244                                                        17
6      title 28, § 2254                        4, 18, 19, 21-23, 25, 26, 27, 31

7  California Evidence Code
       § 1200                                                                  28
8      § 1291                                                                  28

9  California Penal Code
       § 136.1(c)(1)                                                        2, 3
10     § 242                                                                2, 3
       § 288(a)                                                             2, 3
11     § 288a(c)                                                            2, 3
       § 288.2(a)                                                           2, 3
12     § 289(a)                                                             2, 3
       § 654                                                                3, 4
13     § 1181                                                                  3

14

15  **Court Rules**

16  California Rules of Court
        rule 29(a)                                                            23
17

18

19

20

21

22

23

24

25

26

27

28

1  BILL LOCKYER
   Attorney General
2  DAVID P. DRULINER
   Chief Assistant Attorney General
3  RONALD A. BASS
   Senior Assistant Attorney General
4  RENÉ A. CHACÓN
   Supervising Deputy Attorney General
5  BRUCE ORTEGA
   Deputy Attorney General
6  State Bar No. 131145
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-1335
8   Fax: (415) 703-1234

9  Attorneys for Respondent

10                IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                       SAN JOSE DIVISION

13

14  **LUTHER JONES, JR.,**                    C 00-20600 JW (PR)

15                           Petitioner,    **MEMORANDUM OF POINTS
                                            AND AUTHORITIES IN**
16          v.                              **SUPPORT OF THE ANSWER
                                            TO THE ORDER TO SHOW**
17  **LARRY SMALL, in his capacity as Warden of**   **CAUSE**
    **the Centinela State Prison, in Imperial,**
18  **California,**

19                           Respondent.

20

21                         INTRODUCTION

22

23          On June 12, 2000, this Court issued an order directing respondent in this case

24  to show cause why this Court should not grant state prisoner Luther Jones Jr.'s petition

25  for writ of habeas corpus.  6/12/00 Order to Show Cause ("OSC") at 2-3.

26          What follows is that showing.

27  //

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

1

## STATEMENT OF THE CASE

2      By information filed December 29, 1997, the Lake County district attorney charged

3   petitioner in counts 1 and 2 with lewd and lascivious conduct upon a child under 14 years

4   of age, Cal. Pen. Code § 288(a) (hereinafter, unless otherwise specified, all statutory

5   references are the California Penal Code), in count 3 with oral copulation with a child

6   under 14, § 288a(c), in count 4 with willful penetration with a foreign object, § 289(a), in

7   count 5 with exhibiting harmful material to a minor with intent to seduce, § 288.2(a), in

8   count 6 with threatening or intimidation of a witness, § 136.1(c)(1), and in count 7 with

9   misdemeanor battery, § 242.   Exh. A at 39-43.   The district attorney alleged that

10   petitioner committed each of these charged acts during April through May, 1996. *Id.*

11   Petitioner pleaded not guilty. *Id.* at 46-47.

12      On February 9, 1998, the State filed an amended information alleging that petitioner

13   committed all of the charged crimes from March through April, 1996. Exh. A at 63-67.

14   Petitioner renewed his plea of not guilty. *Id.* at 75.

15      Trial by jury began on February 18, 1998. *Id.* at 102-03. On February 26, 1998, the

16   jury declared itself hopelessly deadlocked on all charges, and the court declared a mistrial.

17   *Id.* at 106; Exh. B at 238-40.

18      Retrial commenced with *in limine* motions on March 23 and 31, 1998, with the

19   prosecution seeking admission of petitioner's testimony from the first trial and the court

20   reiterating the changed dates in the amended information. Exh. A at 121-22, 141-42.

21      The presentation of evidence commenced on April 1, 1998. *Id.* at 143; Exh. C at 11.

22   Later that day, the trial court permitted the prosecution to read petitioner's testimony

23   from the first trial into the record, over petitioner's objection. Exh. A at 143; Exh. C at

24   145. The presentation of evidence ended on April 7, 1998. Exh. A at 144; Exh. C at 378.

25      On April 8, 1998, the jury returned its verdict, finding petitioner guilty as charged.

26   Exh. A at 144-51; Exh. C at 511-14.

27

28

1   On May 18, 1998, petitioner filed a motion for a new trial, § 1181, alleging

2   prosecutorial misconduct and insufficiency of the evidence. Exh. A at 212-33.

3   On June 12, 1998, the trial court denied petitioner's motion for a new trial, and

4   sentenced him to 27 years in state prison, imposed as follows: the court ordered petitioner

5   to serve the upper term of eight years on the count 1 conviction for lewd and lascivious

6   conduct upon a child under 14 years old, § 288(a), a consecutive term of two years on the

7   count 2 conviction for lewd and lascivious conduct upon a child under 14, § 288(a), a

8   consecutive eight-year term on the count 3 conviction for oral copulation with a child

9   under 14, § 288a(c), a consecutive eight-year term on the count 4 conviction for willful

10  penetration with a foreign object, § 289(a), and a consecutive one-year term on the count

11  6 conviction for threatening or intimidating a witness, § 136.1(c)(1). The court imposed

12  a concurrent term of three years on the count 5 conviction for exhibiting harmful material

13  to a minor with intent to seduce, § 288.2(a), and a concurrent 180-day county jail sentence

14  on the count 7 misdemeanor battery conviction, § 242. Exh. A at 270-72, 279-80, 282,

15  289-92.

16  Petitioner filed a notice of appeal on June 15, 1998. *Id.* at 275-78. On June 10,

17  1999, the California Court of Appeal, First Appellate District, Division Five, decided the

18  appeal, affirming the judgment of conviction but modifying the judgment to correct a

19  minor sentencing error. Exh. F. "The concurrent sentence imposed on count V is

20  ordered stayed, such stay to become permanent upon completion of the sentences

21  imposed on counts I, II, III, IV, and VI. The trial court is directed to submit a corrected

22  copy of the abstract of judgment to the Department of Corrections. In all other respects,

23  the judgment is affirmed." Exh. F at 12.[1/]

24

25  1. California Penal Code section 654 reads in relevant part as follows: "An act or
    omission that is punishable in different ways by different provisions of law shall be
26  punished under the provision that provides for the longest potential term of
    imprisonment, but in no case shall the act or omission be punished under more than one
27  provision." Not only does Penal Code section 654 preclude multiple punishment for the

28

1    The California Supreme Court denied petitioner's two petitions for review of the

2  court of appeal opinion on August 25, 1999.  Exhs. G, H, I.

3    As noted, by OSC dated June 12, 2000, this Court ordered the State to respond to

4  the petition for writ of habeas corpus petitioner filed in this Court on April 26, 2000.

5    As grounds for federal habeas relief Petitioner contends that:  (1) His
   Fourteenth Amendment due process rights were violated by the trial court's
6  allowing the prosecutor to read his testimony from the first trial into the record,
   when he testified at the second trial; (2) the evidence was insufficient to support
7  the conviction; and (3) he was deprived of effective assistance of appellate
   counsel.

8

9  OSC at 2.

10    These claims that this Court found cognizable are the claims petitioner raised in a

11  petition for writ of habeas corpus in the California Supreme Court on January 6, 2000,

12  which that court denied on March 29, 2000.  Exhs. J, K.

13                          **STATEMENT OF FACTS**[2]

14    La'Esha C. was 10 years old in the spring of 1996.  Exh. C at 11-12.  At some point

15  during that period La'Esha lived in Clearlake with her mother Elizabeth Woods, her

16  brother Robert, her sister Breyona, and petitioner.  *Id.* at 13-14.  According to Woods,

17  she and petitioner lived together "on and off" for the four years prior to 1996, and in

18  March and April 1996 she and her family lived with petitioner in apartment 3 at 14965

19

20  "same act or omission," but "because the statute is intended to ensure that defendant is
   punished 'commensurate with his culpability,' its protection has been extended to cases
21  in which there are several offenses committed during a 'course of conduct deemed to be
   indivisible in time.'"  *People v. Harrison*, 48 Cal. 3d 321, 335, 256 Cal. Rptr. 401, 768 P.2d
22  1078 (1989), citing *People v. Perez*, 23 Cal. 3d 545, 551, 153 Cal. Rptr. 40, 591 P.2d 63
23  (1979); *People v. Beamon*, 8 Cal. 3d 625, 629, 105 Cal. Rptr. 681, 504 P.2d 905 (1973).
   When section 654 is applicable, as with count V, the sentencing court must stay the
24  individual term, not order it to run concurrently.  *People v. Eddahbi*, 199 Cal. App. 3d
   1135, 1143, 245 Cal. Rptr. 330 (1988).
25

26  2.  Because the guilty verdicts returned against petitioner makes clear that the jury
   resolved against him any conflicts or ambiguities in the evidence, the presumption of
27  correctness mandated by 28 U.S.C. § 2254(e)(1) applies to the factual summary of his
   crimes.
28

1    Austin Road in Clearlake. *Id.* at 76-77.[3]  Petitioner was not La'Esha's father, but he was

2    the father of La'Esha's two-year-old sister Breyona. *Id.* at 14, 33, 77, 85, 92.

3        One day, upon Woods leaving for Safeway, petitioner took La'Esha into his bedroom.

4    Exh. C at 15-16, 45.  Petitioner had magazines of naked women ("like Playboy or

5    something") on his bed. *Id.* at 16, 47.  A pornographic movie with "two ladies or

6    something like that" was playing on petitioner's VCR. *Id.* at 16, 52, 54-55.  Petitioner

7    took off his clothes and started taking La'Esha's clothes off. *Id.* at 16, 18.  La'Esha tried

8    to stop petitioner, but he slapped her in the face. *Id.* at 17, 46.  Petitioner thus succeeded

9    in getting La'Esha's clothes off. *Id.* at 17.

10       Petitioner next began touching La'Esha on the chest and vagina. Exh. C at 18.  He

11   penetrated her vagina with at least one finger. *Id.* at 18-20.  Petitioner also had La'Esha

12   touch his penis with her hands and mouth. *Id.* at 18.  Petitioner told La'Esha what to do.

13   *Id.* at 19.  His acts hurt her and made her scared and nervous. *Id.* at 19-20.  He "kind of

14   sort of" made her watch the pornographic movie during this incident. *Id.* at 54-55.

15       The entire incident lasted about 10 minutes, and stopped when Woods returned

16   home about 20 minutes after she had left. Exh. C at 15, 21, 45-46.  Petitioner threw

17   La'Esha's clothes at her and told her to go into the bathroom. *Id.* at 21.  La'Esha did not

18   tell her mother what petitioner had done because petitioner had threatened her with the

19   words, "'If you tell anybody, I'll track you down like a dog and shoot you.'" *Id.* at 21-22,

20   27.  La'Esha believed petitioner. *Id.* at 22.  Petitioner molested La'Esha several times

---

22       3.  At one point on cross-examination, La'Esha testified that she could not recall
23   exactly where she lived in Clearlake in March through April 1996, but that there were
     several cabins on petitioner's property and that petitioner lived in one separate from her
24   and her family and just visited them on occasion. Exh. C at 32-33.  Later in cross-
     examination La'Esha testified as follows: "See, what happened is we lived with him at
25   different times, like we moved, and then we lived with him and did stuff like that. And
     he moved to another one.  What happened was at the time we lived with him at that
26   time. And then we moved away, and that's when we were in the car, and then we were
     in the car, and then we went with him.  And we lived next door or something like that."
27   *Id.* at 48.  Woods testified that she and her children never lived next door to petitioner,
     but always shared an apartment with him. *Id.* at 77.

28

1  between March and April 1996 in a similar fashion, but she could only specifically recall

2  the above incident. *Id.* at 38, 45, 54.  Petitioner did not make the same threat on the

3  other occasions. *Id.* at 54.

4      On another occasion, this one in April 1996, "pretty soon" (a "day or so") after the

5  above-specified sexual assault, Exh. C at 24, 37, while La'Esha and her mother were

6  together with petitioner in his apartment, Woods told La'Esha:

> to be careful because he had just came back from smoking dope or whatever,
> and be careful because he was going to be crazy.  And I was like going around
> the house, picking up dishes, washing them.  And my mom was fixing a bowl of
> Captain Crunch that day, and like I missed a paper plate, and he told me --
> then he got mad at me, and he slammed me with his hands open across my
> face, and I fell on the couch and started crying.
>     And then I picked it up, and I took it to the sink and took off the fork,
> threw the paper plate in the garbage.  And my mom mumbled, "I told you he
> was going to be crazy," to not like piss him off, and I said, "Okay."  And then
> he's all, "What did you say?"  And he slammed the table against her stomach.
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> Then he started -- he -- she dropped her like Captain Crunch.  He pushed
> her against the wall or refrigerator.  I can't remember.  And I took off because
> she said, "Go call the police."  And I knew if I grabbed the telephone, he would
> have taken it away from me.  So I ran out the door barefoot to the brown
> apartments.  There was nobody who would let me use their phone, so I was
> running around going crazy.  And my friend said, "What's wrong.  I seen you
> running across the street real fast."  And I'm all, "My mom's getting beat up."
> So she took me to her house, and I called the police.

17  Exh. C at 23-24.[4]

18      La'Esha was scared at the time of the beating. *Id.* at 24, 50.  According to Woods,

19  who smoked crack, she was eight-and-a-half months pregnant at the time of the beating.

20

---

21      4.  On redirect-examination La'Esha testified that during the April sexual assault she
22  and her siblings and mother lived in the same apartment as petitioner. Exh. C at 51.
    Also on redirect-examination La'Esha stated that at the time of the slapping incident she
23  and her mother and siblings were living "next door or something" to petitioner. *Id.* at 51-
52.  "I'm not really positive, but that's what I'm guessing." *Id.*  Again, Woods denied that
24  fact, *id.* at 77, and she described the beating this way:  "he came down, and he said he
didn't like the way that -- he says, 'Bitch, you think you were smart last night.  You didn't
25  want to do what I told you to do.'  And I told him, I said, 'Luther, I don't want to be
bothered.  Go ahead.'  And he started beating me.  He grabbed me by my throat and
26  slammed me against the wall, and he was choking me and beating me with a closed fist
27  in my face, kicking me in the stomach." *Id.* at 81.  Woods had watched petitioner strike
La'Esha first. *Id.* at 82.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

1   *Id.* at 79, 95. Petitioner was upset with her because the previous evening she had told

2   him she did not want to smoke crack with him anymore and "told him that I didn't like

3   the -- I was tired of going through the fantasies that he wanted me to participate in while

4   he smoked crack cocaine. I didn't feel comfortable with it anymore. I didn't want to

5   participate with watching the porno movies and being a little girl." *Id.* at 79-80.

6      Woods claimed that she and her family moved away from petitioner on April 27,

7   1996. Exh. C at 76-77.

8      It was later in 1996 when La'Esha first told someone about the molestation. *Id.* at

9   26. She told her adult roommates Donita and Ronnie after petitioner gained custody of

10   Breyona. *Id.* at 26-28, 35. "I didn't want him to do the same thing to her as he did to

11   me." *Id.* at 28.

12      A week or so later, in late August 1996, La'Esha also told her school principal,

13   Pamela Smith, about the sexual assaults. Exh. C at 28, 34-35, 111. By that time La'Esha

14   was "withdrawn" and sometimes sleeping in a closet. "She wouldn't say much of anything."

15   *Id.* at 84. According to Principal Smith, La'Esha "was scared and concerned. She was

16   very concerned about her younger sister . . . in Luther Jones' care at that time. . . . [¶]

17   She was afraid that Luther was going to do what he had done to her to her younger

18   sister, and so that's why she was telling me this now, even though the incident happened

19   or the incidents happened prior to this." *Id.* at 112. La'Esha told Smith that petitioner

20   had already hit Breyona and given her a black eye. *Id.* at 120. La'Esha also told Smith

21   about the April 1996 beating petitioner gave Woods, and that La'Esha "was very scared

22   of him." *Id.* at 121.

23      La'Esha told Principal Smith that petitioner committed more than one incident of

24   sexual abuse against her (always when Woods was away) and that the incidents began in

25   February or March of 1996. Exh. C at 112-13, 122-23. "I know that he told her that if

26   she told anybody, he would hunt her down and kill her. And she was very, very upset

27   about that." *Id.* at 125. Smith called the police and Woods. *Id.* at 115-16. Woods'

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

1    reaction surprised Smith.   Woods appeared more concerned about "getting back" at

2    petitioner than she did about La'Esha's physical well-being.  *Id.* at 116.  Woods would

3    "use" her children to get what she wanted.  *Id.* at 117.

4         La'Esha subsequently spoke with Officer Rodney Dewey.  *Id.* at 36, 120, 124, 127.

5    She told him "about the main incident . . . , and she said that there was approximately

6    four others that were generally the same type of incident."  Exh. C at 128-29, 136-37.

7    Further, according to Dewey, La'Esha "was fairly embarrassed talking with me and

8    nervous.  She said that -- the only thing that she told me that there was on some of the

9    other occasions, the only difference would be there was more kissing by Mr. Jones."  *Id.*

10   at 129, 136-37.  "She was real withdrawn."  *Id.* at 129.  La'Esha told Dewey the incidents

11   occurred in April or May 1996.  *Id.* at 132.  La'Esha described petitioner's penis to Dewey

12   as not having any skin on it, but described nothing else about his body.  *Id.* at 136.

13        At trial La'Esha could not recall if petitioner had any tattoos on his body, and could

14   not remember if she had ever said that petitioner had no skin on his penis.  Exh. C at 30,

15   46.  La'Esha "kind of" remembered telling Officer Dewey that petitioner kissed her during

16   the previously-described April 1996 incident.  *Id.* at 49.

17        On October 17, 1996, petitioner appeared at police headquarters in response to a

18   letter Officer Dewey had sent him.  Exh. C at 130-31.  A "very cooperative" petitioner

19   consented to an interview, and during that interview he denied ever sexually assaulting

20   La'Esha or otherwise behaving inappropriately towards her.  *Id.* at 132-33.

21        On April 4, 1997, La'Esha underwent a medical examination.  Exh. C at 30, 42, 138,

22   210-13, 222.  That examination revealed "irregularities" to La'Esha's hymen at the 3, 6,

23   and 9 o'clock positions.  *Id.* at 215-16, 218.  It is not uncommon for girls of La'Esha's age

24   and development to have such irregularities.  *Id.* at 216, 218-19.  The 6 o'clock irregularity

25   was not as common though, and the "problem with the 3 o'clock and 9 o'clock position

26   is there wasn't much hymenal tissue left between the side wall here and that of the

27   vaginal wall.  There wasn't much hymenal tissue that you normally see . . . [¶] It's possible

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

8

1   that the 3 o'clock and 9 o'clock position were actually tears. That at one point in time

2   they were actually together." *Id.* at 219. This finding was consistent with digital

3   penetration. *Id.* at 220.

4       Dr. Anthony Urquiza, a clinical psychologist with the U.C.-Davis Medical Center and

5   an expert who never examined La'Esha, explained the "Child Sexual Abuse

6   Accommodation Syndrome" ("CSAAS"). Exh. C at 56-58, 74. "Many people have myths

7   or misperceptions about what are the sort of consequences after a child has been sexually

8   abused. And so quite simply what the accommodation syndrome does is talk about what

9   is commonly occurring when a child, . . . after they have been abused." *Id.* at 59.

10      There are five parts to the accommodation syndrome, five elements to them.
        And it starts from the understanding of this is what happens with children --
11      commonly happens with children who have been sexually abused. The first one
        is sense of security. Second one is sense of helplessness. The third one is
12      entrapment or accommodation, hence the term child sexual abuse
        accommodation syndrome. The fourth one is a sense of delayed disclosure.
13      And the last one is retraction or recantation.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
14      . . . Most children who are sexually abused are sexually abused with
        someone who they have an ongoing relationship with, that is, at least an
15      acquaintance. It may be father, brother, cousin, stepfather, somebody who they
        have had an ongoing relationship with for a period of time. And most of them
16      -- 85, 90 percent of children are sexually abused by somebody that have some
        acquaintance, an ongoing relationship with over time.
17          That's important because the first element of the accommodation syndrome
        is the issue of secrecy.
18          Kids you can't -- kids often, I should say, back the other way. Perpetrators
        often use some element to keep kids quiet about their victimization. And one
19      of the things they do is they may make some type of threat or coercion to keep
        kids quiet so the child doesn't disclose the victimization, so they won't go to jail.
20      . . . And it may well be very obvious if you tell them -- you know, if you tell
        them you'll get beat up, or somebody else will get beat up, or you'll get hurt.
21      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        Helplessness quite simply refers to the idea that children in our society in
22      retrospect are relatively helpless from those types of manipulations or coercions
        that go on.
23          It's hard for a young child to be able to prevent somebody from making a
        threat and following through on it. . . .
24          Accommodation refers to if a child is being sexually abused, and they can't
        stop it. They're helpless to stop their victimization. They may do some types
25      of behaviors to accommodate or to change what goes on to make the best of a
        bad situation.
26      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        The last two are a delayed disclosure and a retraction. Delayed disclosure
27      quite simply is that children don't immediately -- again, this goes to one of the
        myths. Children don't immediately become sexually abused and then go out and

28

1   tell somebody.  There's a lot of shame and embarrassment that occurs with
    being victimized; plus, this idea about the threat or the coercion is really quite
2   effective.  If you're a young child and somebody says to you, if you go tell, then
    I'm going to beat you up, . . . Those things are really quite effective.  If the child
3   perceives the person will follow through on them, kids stay quiet.

4        So often what happens is there's a delay in the disclosure from when the
    child is first abused to when they finally make some kind of statement to
    somebody that they were sexually abused.

5        And then the last one actually doesn't always happen.  That's the issue of
    retraction.  Some kids retract and say it didn't happen -- and there are some
6   very good reasons for that -- and some kids don't.  Some kids retract the
    allegation that they were abused because pressures are put on them. . . .

7

8   Exh. C at 60-63.

9        Sexually abused children also often delay disclosure not only because of a threat from

10  the perpetrator, but because they observe physical abuse from the perpetrator against

11  others in the home.  *Id.* at 65.  It is not uncommon for the sexually abused child to

12  disclose the abuse for the first time after a separation from the perpetrator.  *Id.* at 65-66.

13  Disclosure may also occur when the child perceives a threat to someone else's safety.  *Id.*

14  at 66.  It is additionally consistent with the CSAAS for the victim to not remember certain

15  aspects of the victimization.  *Id.* at 67.  The experts call it:

16       disassociating.   That if you can't stop it from happening and it's too
         embarrassing or shameful for you to tolerate, you may try to blank it out of your
17       memory.  And we do that all the time.

18  Exh. C at 67.

19       It is also consistent for the victim to not remember certain aspects or things about

20  the perpetrator.  *Id.* at 67-68.  "And, again, we're talking about a child who is being

21  victimized, maybe frightened, terrified, traumatized.  For them to have specific recall of

22  all the little things that went on, I mean, a mark or tattoo. . . . might be difficult."  *Id.* at

23  68.  Dr. Urquiza did acknowledge, however, that some children do make false allegations

24  of abuse.  *Id.* at 73.

25       The prosecution also presented the following evidence in its case-in-chief, the

26  testimony of petitioner given at the first trial in this case:

27

28

1    Petitioner, 50 years old in 1996 and a man who had suffered previous convictions for

2    petty theft, burglary, and on drug charges, owned property in Lake County, including

3    apartments in Clearlake. Exh. C at 148-49, 172, 180.[5]

4    Petitioner was released from prison in February 1996 with $200. *Id.* at 166. He

5    returned to Clearlake to find his property in shambles. *Id.* He stayed with a girlfriend

6    in Nice "for over a month and a half. I did not return to my property until March the

7    13th, 1996, and didn't move back onto it until about the 1st of April." *Id.*

8    Petitioner lived in apartment 4 until April 14, 1996, at which time he moved next

9    door to apartment 3. *Id.* at 149, 152. In late March petitioner had asked a pregnant

10   Elizabeth Woods, the mother of his daughter Breyona (whom petitioner already had

11   custody of), to live in apartment 3 with her other children because they were living out

12   of a car. *Id.* at 150-151, 162. Petitioner's sexual relationship with Woods had been over

13   since late 1994, and they had not gotten along subsequently. *Id.* at 149-50, 153.

14   Petitioner did not live with Woods when she and her children moved into apartment 3

15   on April 1, 1996. *Id.* at 151-52, 155. They lived in apartment 3 only until April 13. *Id.*

16   at 155, 159-60, 163, 167, 172-73. During that time period petitioner did not own a VCR,

17   but borrowed a television set on April 10 or 11, which he kept in the living room of

18   apartment 3 for the kids. Petitioner did not own any pornographic magazines or

19   videotapes at that time. *Id.* at 166-69, 177.

20   Petitioner got along well with La'Esha, and during the period from April 1 to April

21   13, 1996, Woods never left La'Esha in petitioner's charge, nor did she ever leave the

22   property to go to the grocery store or anywhere else. Exh. C at 160-64, 173-74. Woods

23   was "a dope fiend, and she was paranoid." *Id.* at 174. From April 1 to April 13 appellant

24   never called La'Esha into his bedroom; she never saw him naked; he never asked her to

25

26   5. Petitioner owned two duplexes (or "cabins") at 14965 Austin Road in Clearlake,
     as well as a small one-bedroom apartment and a triple wide mobile home at 3757 Hill

27   Road. Exh. C at 148, 152, 173. The duplexes stood right next to each other, with one
     housing apartments 1 and 2, and the other housing apartments 3 and 4. *Id.* at 152.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

1    remove her clothes nor forcibly removed them; and he never had her touch his penis or

2    orally copulate it. *Id.* at 164-66, 169-70. Petitioner had a large tattoo on his upper body:

3    "It's a flower, a red daisy or posy. It is colored, . . . red and green, and above it is two

4    large dragon heads on chains. One going west and one going east." *Id.* at 165, 180-82.

5       Petitioner had Woods removed from his property on April 13, 1996, because of an

6    altercation between them that day. Exh. C at 167, 170-71. Petitioner did not assault

7    Woods during that altercation. She lied in claiming the contrary. *Id.* at 163, 167, 170.

8    He only threw milk and corn flakes on her during an argument "about the drugs on the

9    kitchen table that she had, and the guy that had delivered them was going out my front

10   door there of the apartment." *Id.* at 163, 170, 75. Petitioner, however, admitted that his

11   actions on April 13 ultimately led to his conviction of battery charges (battery against both

12   Woods and La'Esha). *Id.* at 163, 175-76, 178.

13      The trial regarding the April 13 incident, the proceeding in which Woods lied in

14   retaliation for petitioner having complained about drugs found in her apartment, was one

15   of several court hearings involving petitioner and Woods. Exh. C at 153-54. On another

16   occasion "she put me off the property and said that it was her property. I was off for

17   three days by the sheriff's department until I brought the paper work back and showed

18   it was my property." *Id.* at 154. "There was another time which she called the police and

19   said I was harboring a criminal. . . . There were about three other times where she made

20   up straight lies and said I was doing this or doing that or the other. I can't remember

21   them all, but she is a good liar." *Id.* Also according to petitioner, La'Esha "always" did

22   what her mother told her to do. *Id.* at 179.

23      Petitioner received a court judgment formally awarding him custody of Breyona on

24   August 26, 1996. Exh. C at 155-56. At that time, Woods had already taken Breyona

25   away. *Id.* at 156. A couple of days later petitioner retrieved Breyona from Woods and

26   learned from the police that he was being accused of child molestation. *Id.* at 156-59.

27   Petitioner denied the accusations when he met with police, telling them he would never

28

1   do such a thing because "it's not in my make-up." *Id.* at 159. In less than a month,

2   petitioner lost custody of Breyona because of the molestation charges. *Id.* at 176.

3       The prosecution finished its case-in-chief with the testimony of Clearlake Police

4   Officers John Larsen and John Irwin. Each testified that they arrived at apartment 3 at

5   14965 Austin Drive in Clearlake on April 13, 1996, and found Elizabeth Woods on the

6   ground in front of the apartment crying, with an upset and crying La'Esha standing next

7   to her. Exh. C at 185-87, 190-91, 195-97. Both La'Esha and Woods told officers that

8   petitioner had struck and kicked Woods. *Id.* at 187, 196-97. Irwin called for an

9   ambulance. *Id.* at 196. He noticed milk on Woods, redness and scratch marks around

10  her throat, and bruising about the shoulder, upper chest, and neck area. *Id.* at 197-98.

11  La'Esha also said that she had been slapped by petitioner. *Id.* at 194, 204. It was clear

12  to the officers that petitioner lived in the same apartment with Woods and La'Esha. *Id.*

13  at 188, 198-99. Not only did Woods, La'Esha, and petitioner all confirm that to the

14  officers, but a search of petitioner's bedroom uncovered a television, VCR, and

15  pornographic videotapes. *Id.* at 188-89, 191, 198-99, 202. The officers also found a crack

16  pipe under the mattress in the bedroom on petitioner's directive -- petitioner said it

17  belonged to Woods ("he said it was on her side of the bed"). *Id.* at 189-91, 199-200. The

18  officers took petitioner into custody and later took a statement from him. *Id.* at 187. He

19  did not admit to beating Woods, only to throwing milk and corn flakes on her. *Id.* at 192.

20      The defense case was this: petitioner, who was sent to prison at the beginning of

21  1995, was released in February 1996 without the $200 he expected. He nevertheless

22  traveled back home to Clearlake. Exh. C at 232, 235, 280. Petitioner, who was 50 at the

23  time, and who had previous convictions for burglary, auto theft, petty theft, and felony

24  drug charges, owned property in Clearlake. He found his five apartments on Austin

25  Drive in shambles. He went to live with a girlfriend in Nice, California. *Id.* at 230-31,

26

27

28

1    234, 268-69, 277, 280.[6]  When petitioner received $200 from the prison authorities at the

2    end of March or April 1, 1996, he was able to start putting his property back together,

3    and, on April 1, 1996, he finally moved into apartment 4 on Austin Drive. *Id.* at 232, 235-

4    38, 280.  Petitioner later admitted that he moved in on March 13, 1996. *Id.* at 357-58.

5    Petitioner had custody of his young daughter Breyona at that time. *Id.* at 235-36, 238,

6    289.

7         About the same time, petitioner received a call from Elizabeth Woods's mother, who

8    told him that Elizabeth was living in a car, and asked him if he would let Woods and her

9    other children live on his property. Exh. C at 236-37.  Petitioner, whose relationship with

10   Woods had ended in 1994, did not like her. *Id.* at 237.  Nevertheless, he extended an

11   invitation to the pregnant Woods to move onto his property with two of her other

12   children.  Woods accepted the invitation, and moved in on April 1.  *Id.* at 238-40.

13   Petitioner gave custody of Breyona back to Woods, and she and her other children lived

14   in apartment 3, where they stayed until April 13. *Id.* at 238-40, 243, 268, 286, 289.

15   Petitioner never lived with Woods during that period. *Id.* at 241, 281.  He did not have

16   a television until April 10th or 11th, and never had a VCR. *Id.* at 263-64.  Nor did he

17   have any pornographic magazines or videotapes at that time. *Id.* at 264-65, 287.  Woods

18   possessed such magazines and videotapes. *Id.* at 296-97.  From April 1 to April 13

19   petitioner never cared for the kids and never saw Woods leave the property: "She was

20   too far gone on drugs." *Id.* at 258-59, 285, 295-96.

21        On April 13, 1996, petitioner walked into apartment 3 and saw drugs on the dining

22   room table.  After he smashed them Woods started "hollering" at him. Exh. C at 245.

23   He threw milk and corn flakes on her only; he did not hit her. *Id.* at 245, 284.  He did

24   not hit La'Esha. *Id.* at 265.  Woods faked being hurt on April 13 and threw dirt on

25

26   _____

27        6.  14965 Austin Drive, where the two duplexes were located, was a "connecting
     address" to 3757 Hill Drive, where petitioner's studio apartment and "three-wide mobile"
28   home were located. Exh. C at 230-31.

     MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
     SHOW CAUSE (C 00-20600 JW (PR))
                                         14

1    herself as she lay on the ground outside. *Id.* at 242, 284-85. On that day, petitioner did

2    not tell the police to retrieve Woods' crack pipe from under the bed. *Id.* at 243.

3        Subsequently, petitioner was tried over the April 13 incident. Woods and La'Esha

4    testified against him, and he was convicted of battery. Exh. C at 244-45.

5        Petitioner and Woods continued custody suits over Breyona, with petitioner

6    ultimately losing the formal custody he had gained on August 26, 1996. *Id.* at 247-53, 276-

7    77, 288-89, 304-05.

8        Petitioner eventually denied the allegations La'Esha made to the police. Exh. C at

9    253-55. "That's not me." *Id.* at 254. La'Esha made the charges because Woods put her

10   up to it. *Id.* at 284, 287. Petitioner was never alone with La'Esha, nor naked in front of

11   her, nor did he ever forcibly take her clothes off, nor touch her or make her orally

12   copulate him. *Id.* at 260, 263, 265-66. He made no threat to her. *Id.* at 266. Petitioner

13   had a large flower and dragon head tattoo on his chest. *Id.* at 261-62. He also had a

14   large birthmark on his left thigh. *Id.* at 263. The police never gave petitioner the lie

15   detector test he requested. *Id.* at 254.

16       According to petitioner, when La'Esha was around her mother La'Esha "was

17   withdrawn and into herself. She -- no smiling, no laughing, which I guess it was just like

18   somebody waiting to hear somebody else say something." Exh. C at 256. Petitioner often

19   heard Woods call La'Esha names and often saw Woods hit La'Esha. *Id.* at 256-57.

20       Petitioner called La'Esha to the stand and she admitted that at a prior proceeding

21   she had had trouble remembering what transpired in the movies appellant had showed

22   her. *Id.* at 309. She also admitted that at that prior proceeding she did not know what

23   the titles were to the magazines she had observed on petitioner's bed. *Id.* at 310.

24       Yolanda Davis was a friend of petitioner's and a former friend of Elizabeth Woods.

25   Exh. C at 316-17. In 1996, La'Esha never told Davis about any molestation. *Id.* at 318.

26   Davis saw petitioner interact with children and never noticed any inappropriate behavior.

27   *Id.* Woods once told Davis, in regards to the custody of Breyona, that she wanted

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

15

1  petitioner in prison. *Id.* at 319-20. "She told me one time that she would never let

2  Luther get custody of Breyona." *Id.* at 322. Woods again implied that she would send

3  petitioner to jail. *Id.* Davis could not remember La'Esha ever telling a lie about

4  something important, but further, according to Davis, La'Esha will obey her mother. *Id.*

5  at 321. Whatever Woods asked La'Esha to do, La'Esha "would do it." *Id.* at 325.

6      Charles Miller, the father of two of Woods's children, agreed with that assessment.

7  Exh. C at 326, 329-30. Miller believed that La'Esha would even lie if Woods told her to.

8  *Id.* at 330. They were "two peas in a pod." *Id.* at 329. Miller recalled that one time,

9  after he had Woods removed from living on his premises, she accused him of molesting

10  her son Robert. *Id.* at 330. And, in the spring of 1996 (or perhaps in the summer, after

11  petitioner was released from jail for hitting Woods), Woods complained to Miller about

12  petitioner having molested both La'Esha and Breyona. *Id.* at 331-32, 334-35, 374. With

13  a "wild, angry" demeanor Woods threatened to put petitioner in jail. *Id.* at 337. Miller

14  believed every word out of Woods's mouth was "a lie." *Id.* at 332.

15      Shaquirah J., age 16, testified that sometime between 1990 to 1992, La'Esha and her

16  brothers lived with Shaquirah and her family. Exh. C at 346-47, 349. Shaquirah was in

17  the 4th or 5th grade at the time. *Id.* at 347. Shaquirah testified that during this time

18  period she and La'Esha had a conversation in which La'Esha stated that her brother

19  Deandre had molested her. *Id.* at 347-48. Shaquirah confronted Deandre about the

20  allegation, and also told her mother, Carmin Harris, about La'Esha's allegation. *Id.* at

21  348.[7]

22      Carmin Harris confirmed that during 1991 she cared for Woods' children. Exh. C

23  at 351-52. At some point Shaquirah reported to her that La'Esha was accusing Deandre

24  of molesting her. *Id.* at 352. When Harris asked La'Esha about the allegation, La'Esha

25

26

27      7. Petitioner also lived with Shaquirah and her family for a time, and never engaged

28  in any inappropriate behavior. Exh. C at 346.

1    denied making it. *Id.* at 353.  Following that conversation, Harris took La'Esha to the

2    doctor for an examination. *Id.* at 353.

3        In rebuttal, the prosecution presented this evidence: in an interview on July 12, 1996,

4    petitioner at one point stated that prior to April 13, 1996, Woods lived in apartment 4.

5    At another point in that interview petitioner said Woods lived in apartment 3.  Exh. C

6    at 364-68.  On November 11, 1997, petitioner reported that prior to April 13 he lived in

7    apartment 3 and Woods in apartment 4. *Id.* at 368-75.

8                              **STANDARD OF REVIEW**

9        Not only does the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

10   impose a one-year statute of limitations upon state prisoners seeking to collaterally

11   challenge state judgments in federal court by way of a petition for writ of habeas corpus

12   (a statute of limitations petitioner has met), but the AEDPA places new constraint on the

13   power of federal habeas courts to grant state prisoner applications for habeas relief with

14   respect to claims adjudicated on the merits in state court.[8]  As this Court knows, the

15   AEDPA limits issuance of the writ to circumstances in which one of two conditions is

16   satisfied.  Issuance is in order only when the state court proceedings (1) "resulted in a

17   decision that was contrary to, or involved an unreasonable application of, clearly

18   established Federal law, as determined by the Supreme Court of the United States"; or

19   (2) "resulted in a decision that was based on an unreasonable determination of the facts

20   _____

21       8. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") made
22   numerous substantive changes to federal habeas corpus. The AEDPA is divided into nine
     (9) Titles dealing with various subjects such as terrorism, immigration, nuclear weapons,
23   and victim's rights. Title I of the Act, entitled "Habeas Corpus Reform," amended certain
     provisions of the law applicable to federal habeas corpus proceedings. Section 101 of the
24   AEDPA added a new subsection 28 U.S.C. § 2244, part of Chapter 153 of Title 28 of the
     United States Code.  It established a one-year deadline or statute of limitations for an
25   "application" for writ of habeas corpus.  There is no dispute that Chapter 153 of the
     AEDPA applies to this case.  Because petitioner's present federal habeas proceedings
26   have commenced well after President Clinton's April 24, 1996, signing of the AEDPA into
27   law, that statute governs this case. *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138
     L. Ed. 2d 481 (1997).

28

1  in light of the evidence presented in the State Court proceeding."   28 U.S.C. §

2  2254(d)(1)(2).

3      As the United States Supreme Court recently made clear in *Williams v. Taylor*, 529

4  U.S ---, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000):

5      Under the "contrary to" clause, a federal habeas court may grant the writ if the
       state court arrives at a conclusion opposite to that reached by this Court on a
6      question of law or if the state court decides a case differently than this Court
       has on a set of materially indistinguishable facts.   Under the "unreasonable
7      application" clause, a federal court may grant the writ if the state court identifies
       the correct governing legal principle from this Court's decisions but
8      unreasonably applies that principle to the facts of the prisoner's case.

9  *Williams v. Taylor*, 120 S. Ct. at 1523.

10     The *Williams* court recognized that the "contrary to" and "unreasonable application"

11  categories can overlap, and that, even for purposes of precise definition, it is difficult to

12  determine whether a decision, for example, unreasonably extended a rule to a new

13  context or simply contradicted controlling authority.   120 S. Ct. at 1521.

14     In any event, the High Court in *Williams* proceeded to define what exactly qualifies

15  as an "unreasonable application" of law under the AEDPA:  "Stated simply, a federal

16  habeas court making the "unreasonable application" inquiry should ask whether the state

17  court's application of clearly established federal law was objectively unreasonable."  *Id.*

18         The term "unreasonable" is no doubt difficult to define.  That said, it is a
        common term in the legal world and, accordingly, federal judges are familiar
19      with its meaning.  For purposes of today's opinion, the most important point is
        that an unreasonable application of law is different from an incorrect
20      application of federal law.

21  *Id.* at 1522.

22     Phrased another way, under § 2254(d)(1)'s "unreasonable application" clause, "a

23  federal habeas court may not issue the writ simply because that court concludes in its

24  independent judgment that the relevant state-court decision applied clearly established

25  federal law erroneously or incorrectly.   Rather, that application must also be

26  "unreasonable."  *Williams v. Taylor*, 120 S. Ct at 1522.

27

28

1      As a judge of this Court itself recently stated, the AEDPA "demands deference" to

2  the state court disposition of the federal habeas claims. *Shumate v. Newland*, 75 F. Supp.

3  2d 1076, 1084 (N.D. Cal. 1999).

4      The Ninth Circuit has held that when a federal habeas court analyzes a claim that

5  the state court unreasonably applied federal law, the federal court "must first consider

6  whether the state court erred; only after we have made that determination may we then

7  consider whether any error involved an unreasonable application of controlling law within

8  the meaning of § 2254(d)." *Van Tran v. Lindsey*, 212 F.3d 1143, 1155 (9th Cir. 2000).

9  When the federal habeas court then considers whether any state court error involved an

10  unreasonable application of controlling law within the meaning of § 2254(d), it can so

11  hold only "when our independent review of the legal question does not merely allow us

12  ultimately to conclude that the petitioner has the better of two reasonable legal

13  arguments, but rather leaves us with a 'firm conviction' that one answer, the one rejected

14  by the state court, was correct, and the other, the application of the federal law that the

15  state court adopted, was erroneous -- in other words that clear error occurred." *Tran v.*

16  *Lindsey*, 212 F.3d at 1153-54.

17  **ARGUMENT**

18  **PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS**
19  **CORPUS RELIEF**

20      To quickly review, on direct appeal from the judgment of conviction returned against

21  petitioner at his retrial, petitioner's appointed appellate counsel raised three issues in the

22  intermediate court of appeal:  (1) that the trial court prejudicially abused its discretion

23  in admitting into evidence in the prosecution's case-in-chief petitioner's testimony from

24  the first trial, Exh. D at 17-23; (2) that the evidence the prosecution presented to prove

25  the sex offenses "was insufficient as a matter of law" to sustain the convictions; Exh. D

26  at 24-29; and (3) that the trial court committed sentencing error, Exh. D at 30-31.

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

1    The state court of appeal agreed in part with petitioner's claim of sentencing error

2    ("[t]he concurrent sentence on count V is ordered stayed," Exh. F at 12), but denied the

3    remainder of his appeal.  In her petition to the California Supreme Court for review of

4    the court of appeal opinion, petitioner's appointed counsel raised only one issue: that the

5    state court of appeal erred in concluding that the evidence presented at trial was

6    sufficient as a matter of law to sustain the sex offense convictions.  Exh. G at 1, 16.

7        In a pro per petition to the California Supreme Court for review of the court of

8    appeal opinion affirming his convictions, petitioner raised the following two issues:

9        I.  Review Should Be Granted To Determine Whether A Trial Court
           Abuses Its Discretion In Permitting The Prosecution To Read Appellant's
10        Testimony From The Previous Trial Into Evidence When Appellant Himself Is
           Available To Testify
11        II.  Review Should Be Granted To Determine Whether An Accused
           Conviction May Be Upheld When The Evidence Was Insufficient As A Matter
12        Of Law To Sustain Appellant's Conviction For Assaulting LaEsha C.

13   Pet. H at 2, 16, 23.

14       The California Supreme Court denied the petitions for review by one-line denial.

15   Exh. I.  Petitioner subsequently filed a petition for writ of habeas corpus with the

16   California Supreme Court, see Exh. J, raising the same three issues that he raises in this

17   Court.  One, that the trial court's admission of his prior testimony amounted to a federal

18   due process violation.  Two, that his federal due process rights are being violated by his

19   imprisonment upon convictions that are not supported by substantial evidence.  And

20   three, that he was the victim of ineffective assistance of appellate counsel because

21   counsel, on direct appeal and in her petition for review, premised her arguments upon

22   state law only, and did not assign federal constitutional error to the "prior testimony" and

23   "insufficient evidence" claims.  Compare Exh. J with Pet.

24       The California Supreme Court denied the habeas petition by one-line denial.  Exh.

25   K.

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

20

A. **The California Supreme Court Did Not Rule Contrary To Nor Unreasonably Apply Clearly Established United States Supreme Court Precedent In Rejecting Petitioner's Claim That He Was The Victim Of Ineffective Assistance Of Appellate Counsel**

Working backwards, the State first establishes the meritlessness, under the AEDPA, of petitioner's contention that he is due habeas corpus relief because he was the victim of ineffective assistance of appellate counsel. Pet. at 7; 3-A to 3-B.

Under the AEDPA the claim is meritless because the California Supreme Court clearly and reasonably applied United States Supreme Court case law in rejecting it. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 120 S. Ct. at 1521-23.

Because, doubtless, petitioners have a right to counsel on first appeal as a matter of right, *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983), the *Strickland v. Washington* principles governing constitutionally competent counsel apply to appellate counsel, *Miller v. Keeney*, 882 F.2d 1428, 1431 and n.2 (9th Cir. 1989). This means that sustained claims of ineffective assistance of counsel on appeal must include a sufficient showing of deficiency (i.e., substandard performance by counsel under the standards of reasonable lawyering), and prejudice (i.e., that but for counsel's errors petitioner would have prevailed on appeal). *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Miller v. Keeney*, 882 F.2d at 1434 n.9.

Moreover, in addition to the *Strickland v. Washington* teachings, judges reviewing allegations of ineffective assistance of *appellate counsel* must keep in mind that appellate lawyers have no constitutional obligation to raise every possible *nonfrivolous* issue. *Jones v. Barnes*, 463 U.S. at 751-52. Indeed the High Court in *Jones v. Barnes* recognized that "since time beyond memory" experienced advocates "have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id*. Phrased another way, appellate counsel need not raise every possible issue of law at the risk of being found ineffective, *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980).

1        This Court is well aware that federal habeas corpus review cannot take place for

2    unexhausted claims, i.e., for claims not decided on the merits by the state's highest court.

3    28 U.S.C. § 2254(b)(c); *Rose v. Lundy*, 455 U.S. 509, 515-16, 102 S. Ct. 1198, 71 L. Ed.

4    2d 379 (1982).    Petitioner faults counsel for failing to "raise and argue his federal

5    constitutional issues and violations on direct appeal." Pet. at 7, 3-A to 3-B.    In other

6    words, petitioner is faulting appellate counsel for not exhausting for him the claims that

7    his "Fourteenth Amendment due process rights" were violated by (1) the admission of his

8    prior testimony; and (2) convicting him on insufficient evidence.    Pet. at 3-A to 3-B.

9    Petitioner's claim that "a failure to exhaust" amounts to a failure of effective assistance

10    of appellate counsel is meritless for several reasons.

11        First, appellate counsel exhausted the "insufficient evidence" claim for petitioner.

12    Not only is any challenge to the sufficiency of the evidence to convict in a state

13    prosecution necessarily a due process challenge to the conviction thereby presenting the

14    federal question necessary to make a claim cognizable on federal habeas corpus,

15    *Tamapua v. Shimoda*, 796 F.2d 261, 262 (9th Cir. 1986); *Satter v. Lapley*, 977 F.2d 1259,

16    1262 (8th Cir. 1992), but appellate counsel cited *Jackson v. Virginia*, 443 U.S. 307, 99 S.

17    Ct. 2781, 61 L. Ed. 2d 560 (1979), in her petition for review in the California Supreme

18    Court. Exh. G at 16. *Jackson*, of course, is the United States Supreme Court case which

19    sets forth the standard of review governing claims alleging insufficient evidence.

20        Second, because petitioner has not suffered a dismissal of his present federal habeas

21    petition for having presented an unexhausted claim, he has suffered no prejudice from

22    appellate counsel's decision not to exhaust the "admission of his prior testimony amounted

23    to a due process violation" claim for him.    Petitioner obtained a review of the merits

24    himself on state habeas corpus of that issue his appellate lawyer did not present to the

25    state high court in the petition for review she prepared on petitioner's behalf. *See* Exhs.

26    G, J, K.    Thus, petitioner satisfied the federal habeas corpus exhaustion requirement.

27

28

1    Third, to require an appellate lawyer to raise in his petition for review all the claims

2    raised on direct appeal in the lower reviewing court, or else be found ineffective, would

3    be inconsistent with the lawyer's "best professional judgment" extending to direct review

4    in the state high court. Rule 29(a) of the California Rules of Court governs what issues

5    are most likely to garner a state high court review, and not all issues raised in the lower

6    appellate court can obviously qualify.

7    > Review by the Supreme Court of a decision of a Court of Appeal will be
     ordered (1) where it appears necessary to secure uniformity of decision or the
8    settlement of important questions of law; (2) where the Court of Appeal was
     without jurisdiction of the cause; or (3) where, because of disqualification or
9    other reason, the decision of the Court of Appeal lacks the concurrence of the
     required majority of qualified judges.
10

11   Cal. Rules of Court, rule 29(a).

12   Lastly, the right to counsel on appeal does not even extend to the "second appeal,"

13   *Ross v. Moffitt*, 417 U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974), i.e., a petition for

14   discretionary review to the California Supreme Court, *id*. Under California law, an

15   appellant has a right of appeal to the intermediate appellate court, but not the state high

16   court. *Grageda v. United States I.N.S.*, 12 F.3d 919, 921 (9th Cir. 1993) (citing *Lawson v.*

17   *Kolender*, 658 F.2d 1362, 1364 (9th Cir. 1981); *People v. Davis*, 147 Cal. 346, 348, 81 P.

18   718 (1905)).

19   Accordingly, counsel's failure to pursue on issue in a petition for review cannot

20   amount to constitutional ineffectiveness. The California Supreme Court did not rule

21   contrary to, nor unreasonably apply, clearly established United States Supreme Court

22   precedent in rejecting petitioner's ineffective assistance of appellate counsel claim. 28

23   U.S.C. § 2254(d)(1); *Williams v. Taylor*, 120 S. Ct. at 1521-23. The state high court's

24   application of *Jones v. Barnes* and *Strickland v. Washington* was "objectively reasonable."

25   *Id*.

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
SHOW CAUSE (C 00-20600 JW (PR))

23

1    **B.    The California Supreme Court Did Not Rule Contrary To Nor Unreasonably**
     **Apply Clearly Established United States Supreme Court Precedent In Finding**
2    **That Sufficient Evidence Supports The Sex Offense Convictions**

3    On direct appeal, petitioner maintained that there existed insufficient evidence to

4    sustain his sex offense convictions, and that therefore, the court of appeal should reverse

5    them. Exh. D at 24-29. The intermediate appellate court disagreed, as follows:

6    Defendant contends that the evidence presented at trial concerning the
     sexual abuse of La'Esha raised "more than a reasonable doubt" about
7    defendant's guilt and was therefore insufficient to support his convictions. What
     defendant ignores, however, is that it is the jury, not the appellate court, that
8    must be convinced of the defendant's guilt beyond a reasonable doubt. (*People
     v. Ceja* (1993) 4 Cal.4th 1134, 1139 [17 Cal. Rptr. 2d 375, 847 P.2d 55]; *People
9    v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal. Rptr. 467, 760 P.2d 996].) Our role
     in considering a claim of insufficient evidence is limited. We "'review the whole
10   record in the light most favorable to the judgment below to determine whether
     it discloses substantial evidence—that is, evidence which is reasonable, credible,
11   and of solid value—such that a reasonable trier of fact could find the defendant
     guilty beyond a reasonable doubt.' [Citations]." (*Ceja, supra,* at p. 1138; *People
12   v. Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal. Rptr. 431, 606 P.2d 738].)
     We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate
13   the credibility of the witnesses. If the circumstances reasonably justify the jury's
     findings, it is of no consequence that the circumstances might also support a
14   contrary finding. (*Ceja, supra,* at p. 1139.)
15   Here, the testimony of La'Esha provided substantial evidence that
     defendant committed the charged sexual offenses. La'Esha testified that
16   defendant took off his clothes and began removing her clothes, too. When
     La'Esha tried to stop him, defendant slapped her and removed the rest of her
17   clothes. He then began touching La'Esha and put his finger in her vagina. He
     also had La'Esha touch his penis with her hands and mouth. This testimony
18   fully supports the charges of two lewd acts, penetration with a foreign object,
     and oral copulation.
19   Defendant points to various factors casting doubt on La'Esha's credibility:
     (1) La'Esha claimed about four or five incidents had occurred under similar
20   circumstances; yet, Elizabeth Woods testified she did not leave the children
     alone, except once. (2) La'Esha told Pamela Smith, the vice-principal, and
21   Officer Dewey that the molestations occurred in February or March; yet,
     defendant was not released from prison until mid-February and did not return
22   to Clearlake until the end of March or early April. (3) La'Esha could not
     remember many details of the offense in particular did not recall a tattoo;
23   yet, defendant has a large red flower and a dragon tattooed on his chest. (4)
     La'Esha did not report the molestation to the police officers when they arrived
24   for the April 13 incident. (5) The physical examination was not concluded until
     a year after the assault, and the hymeneal irregularities were inconclusive proof
25   of a sexual assault. (6) La'Esha had previously accused her older brother of
     molesting her. (7) Both La'Esha and her mother had a motive to bring false
26   charges against defendant so as to prevent defendant from gaining custody of
     Breyona.
27   Those factors, of course, were for the jury to consider in assessing La'Esha's
     credibility, as, indeed, defense counsel argued in his final summation. The
28   testimony of a single witness, unless the testimony is physically impossible or

1    inherently improbable, is sufficient to sustain a conviction, even if it is
     inconsistent or contradicted by other evidence. (*People v. Scott* (1978) 21 Cal.3d
2    284, 296 [145 Cal. Rptr. 876]; *People v. Leigh* (1985) 168 Cal.App.3d 217, 221
     [214 Cal. Rptr. 61].)
3        La'Esha's testimony was neither physically impossible nor inherently
     improbable. Moreover, the jury heard other evidence to indicate the reliability
4    of La'Esha's testimony. La'Esha told her school vice-principal about the sexual
     assault by defendant, and she gave a consistent report to Officer Dewey of the
5    Clearlake Police Department. Medical testimony indicated that the irregularities
     in La'Esha's hymen were consistent with digital penetration. The evidence
6    concerning the child sexual assault accommodation syndrome showed that it is
     consistent with the truth for a sexually abused child to delay disclosure of the
7    crime and to lack a detailed recollection of the events. And, finally, as the
     prosecutor pointed out in closing argument, defendant lost custody of Breyona
8    even without the molestation charges: custody was returned to Elizabeth Woods
     as soon as she cured her default. The molestation charges were instituted well
9    after that.

10   Exh. F at 6-8.

11       In both of his petitions to the California Supreme Court for review of the court of

12   appeal opinion, petitioner reiterated his contention that insufficient evidence supported

13   the sex offense convictions. Exh. G; Exh. H at 1-2, 23-28. The California Supreme Court

14   denied the petitions for review. Exh. I  In his petition to the California Supreme Court

15   for a writ of habeas corpus, petitioner once again contended, inter alia, that insufficient

16   evidence supported the sex offense convictions. Exh. J at 4-A, 4-V to 4-ZZ. The state

17   high court denied the petition for habeas relief. Exh. K. In its implicit acceptance of the

18   above analysis from the court of appeal on the "insufficient evidence" claim, the California

19   Supreme Court did not rule contrary to, nor unreasonably apply, clearly established

20   United States Supreme Court precedent. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 120

21   S. Ct. at 1521-23. The state high court ruling also did not "result[] in a decision that was

22   based on an unreasonable determination of the facts in light of the evidence presented

23   in the State Court proceeding." 28 U.S.C. § 2254(d)(2).[9]

24

25       9. The California Supreme Court's one-line denial of petitioner's petitions for
     review and his petition for writ of habeas corpus, *see* Exhs. I, K, are due deference
26   because they constituted decisions on the merits. For several years the Ninth Circuit has
     held that one-line "silent" or so-called "postcard" denials are decisions on the merits.
27   *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992). It is true that recently the Ninth

28

1    The state court of appeal, in rejecting petitioner's present claim that insufficient

2    evidence supports the sex offense convictions, recognized California's standard of review

3    for such claims -- that it review the whole record in the light most favorable to the

4    judgment below to determine whether it discloses substantial evidence, i.e., evidence

5    which is reasonable, credible, and of solid value, such that a reasonable trier of fact could

6    find the defendant guilty beyond a reasonable doubt. *People v. Johnson*, 26 Cal. 3d at

7    576-78. The standard of substantial-evidence review mandated by the federal Constitution

8    is the same as the state standard articulated above. That is, the critical inquiry is a

9    determination of whether the record evidence reasonably supports a finding of guilt

10

11   Circuit, in the case of *Delgado v. Lewis*, 181 F.3d 1087, 1091-92 & n.3. (9th Cir. 1999),
*vacated on other grounds, Lewis v. Delgado*, --- U.S. ---, 120 S. Ct. 1002, 145 L. Ed. 2d 296

12   (2000), held that habeas courts do not owe state court one-line denials any deference
under the AEDPA: "Unfortunately, when a state court does not articulate the rationale

13   for its determination, a review of that court's 'application' of clearly established federal
law is not possible. Thus, when confronted with a state court decision that does not

14   provide the basis of its decision, we must determine whether, in light of an independent
review of the record and the relevant federal law, the state court's resolution of a

15   petitioner's claim was 'contrary to, or involved an unreasonable application of,' clearly
established Federal law, as determined by the Supreme Court of the United States.'" *Id.*

16   at 1091 (citations and footnotes omitted). "Conducting an independent review of the

17   record and applicable federal law when the state has not articulated its reasoning is not
the equivalent of applying a de novo standard of review to state court decisions under

18   these circumstances; rather, it provides the method for ascertaining whether the state
court's resolution of the case was 'contrary to, or involved an unreasonable application

19   of, clearly established Federal law' under AEDPA. 28 U.S.C.A. § 2254(d)(1). This

20   approach is in consonance with the deference we have accorded state court findings of
fact on habeas review. Although AEDPA ordinarily requires federal courts to defer to

21   state court factual findings, we have, in a number of cases in which the state court did not
make findings of fact, granted less deference to the state court decision." 181 F.3d at

22   1091-92 n.3.

23   *Delgado v. Lewis* is distinguishable, however. There, the state high court's one-line
denial followed a court of appeal decision on the case *also made without written opinion.*

24   Here, by contrast, the supreme court's habeas denial, Exh. K, and its denial of the
petitions for review, followed a written opinion on petitioner's "insufficient evidence"

25   claim, Exh. F at 6-8. And, in *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115

26   L. Ed. 2d 706 (1991), the United States Supreme Court stated that one must presume
that a state court, by a silent denial, does not intend to change the last-reasoned decision

27   rejecting a claim. Put differently, it is permissible to "look-through" the silent denial to
the last-reasoned judgment, and give both deference.

28

1     beyond a reasonable doubt.  The reviewing court does not determine whether *it* believes

2     that the evidence at trial established guilt beyond a reasonable doubt, but whether, after

3     viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

4     fact could have found the essential elements of the crime proved beyond a reasonable

5     doubt.  *Jackson v. Virginia*, 443 U.S. at 318.

6          Petitioner fails to even to attempt to show, much less establish, how the state courts

7     ruled contrary to, or unreasonably applied *Jackson*.  Nor does he establish that the state

8     reviewing courts, in finding that substantial evidence supported the sex offense

9     convictions, made "an unreasonable determination of the facts in light of the evidence

10    presented in the State Court proceeding."  28 U.S.C. § 2254(d)(2).  When this Court

11    reviews the state record, it will find that the state appellate courts did not make an

12    unreasonable factual determination.  *See* pp. 4-17, *ante*.

13         Petitioner's second claim, like his first, fails under the AEDPA.

14

15    **C.   The California Supreme Court Did Not Rule Contrary To Nor Unreasonably**
      **Apply Clearly Established United States Supreme Court Precedent In Finding**
16    **That The Admission Into Evidence At Petitioner's Second Trial Of His**
      **Testimony From The First Trial Did Not Violate Due Process**

17         It is clear that petitioner's current state court convictions came upon a retrial.  A

18    previous jury had deadlocked on the charges and the trial court had declared a mistrial.

19    Exh. A at 106; Exh. B at 238-40.  Petitioner's first claim, as phrased by this Court, is that

20    his "Fourteenth Amendment due process rights were violated by the trial court's allowing

21    the prosecutor to read his testimony from the first trial into the record, when he testified

22    at the second trial."  OSC at 2.

23         When petitioner raised this claim on direct appeal in both the intermediate appellate

24    court and state supreme court, he assigned error on state law grounds only, calling the

25    trial court's admission decision an "abuse of discretion."  Exh. D at 17-23; Exh. H at 2,

26    16-22.  The court of appeal rejected the assignment of error thusly:

27              In a pretrial motion in limine, the prosecution sought to admit defendant's
            testimony from the first trial to show consciousness of guilt in that defendant's
28

1   exculpatory testimony was an attempt to cover up his guilt. The matter was deferred until trial, at which time defendant objected that the evidence was
2   irrelevant and cumulative and, further, that defendant was not unavailable as a witness because he would be testifying at this trial. The trial court ruled the
3   evidence admissible as former testimony.

4   At that point in the proceedings, the prosecution had already presented in its case-in-chief the testimony of La'Esha and her mother as well as witnesses to whom La'Esha had reported the molestation. The prosecution had also
5   presented expert testimony concerning the child sexual abuse accommodation syndrome. Defendant's testimony from the first trial was then read to the jury.

6   In that prior testimony, defendant denied that Elizabeth Woods and her children lived with him; he testified that he lived in the apartment next door.
7   Defendant denied that Elizabeth Woods ever left La'Esha at home with him and denied any sexual contact with La'Esha. He denied owning a VCR or any
8   pornographic magazines or videos. He also denied assaulting Elizabeth Woods in the April 13 altercation. Defendant testified that he merely threw milk and
9   corn flakes at Elizabeth during an argument about Elizabeth's drug use, although he conceded he was convicted of battery of both La'Esha and
10  Elizabeth as a result of the incident.

    Following the presentation of defendant's prior testimony, the prosecution
11  produced two police witnesses, who had not testified at the first trial, who contradicted defendant's testimony concerning the April 13 incident. Both
12  officers testified that Elizabeth had reportedly been beaten and kicked by defendant. Officer Irwin described the visible injuries to Elizabeth. Both
13  officers concluded that defendant was living with Elizabeth and La'Esha in the same apartment. Not only did defendant tell Sgt. Larsen so, but an inspection
14  of the apartment confirmed that a man was living there. Moreover, defendant told Sgt. Larsen that a crack pipe belonging to Elizabeth Woods could be found
15  under the mattress, under her side of the bed. Both officers also testified that they found pornographic videos in the bedroom.

16  The legal issue as framed by the parties is whether a defendant who indicates that he plans to testify at trial qualifies as being "unavailable" for
17  purposes of admitting his previous testimony as "former testimony" under Evidence Code section 1291. (See generally *People v. Reed* (1996) 13 Cal.4th
18  217, 225-227 [52 Cal. Rptr. 2d 106, 914 P.2d 184] [applying "pragmatic" approach to concept of unavailability].) However, we find it unnecessary to
19  reach that issue, as we conclude that Evidence Code section 1291 is not at issue. Section 1291 establishes an exception to the hearsay rule, rendering admissible
20  former testimony that would otherwise be inadmissible hearsay. Yet here, as the prosecution argued below, defendant's testimony from his first trial was not
21  being admitted to prove the truth of the matters stated; the prosecution obviously was not attempting to establish that defendant was innocent of the
22  charges, as he so testified. Rather, the prosecution's stated purpose of the testimony was to show a consciousness of guilt in that defendant fabricated his
23  testimony at the first trial. Defendant's prior testimony was not hearsay. (Evid. Code, § 1200.)

24  Because defendant's prior testimony was not hearsay, the real question is not whether the prior testimony came within an exception to the hearsay rule
25  but whether the testimony was relevant to the issues at the second trial. Defendant does not seem to challenge the relevancy of his own prior testimony.
26  Instead, his brief focuses on the testimony of the two police officers concerning the April 13 incident.

27  We find no error in the trial court's ruling that the testimony of the two police officers was relevant to the issues at trial. La'Esha and Elizabeth both

28

1   testified about the April 13 incident, without any objection by defendant.
2   Indeed, the evidence was pertinent to show La'Esha's fear of defendant and to
    explain, as indicated by the testimony on child sexual abuse accommodation
3   syndrome, why La'Esha might have delayed disclosing defendant's acts of sexual
    abuse. We observe that on cross-examination of Pamela Smith, La'Esha's vice-
    principal, defense counsel elicited that La'Esha had reported the April 13 fight
4   to her and that La'Esha was "very scared of [defendant]" because of their fight.
5       Defendant contends that the police testimony had no relevance as
    impeachment evidence because the police officers did not actually impeach
6   defendant. Our review of the record, however, discloses at least three direct
    contradictions between the testimony of the police officers and defendant's prior
7   testimony—(1) on whether Elizabeth Woods had actually been beaten and
    kicked or was feigning the attack; (2) on whether defendant was living in the
    apartment with Elizabeth Woods and her children; and (3) on whether
8   defendant possessed pornographic materials.
9       In his direct testimony, defendant denied the April 13 beating, denied living
    with Elizabeth Woods and her children, and denied owning pornographic
10  materials. Certainly the prosecution could have introduced the police witnesses
    to contradict defendant's testimony and to corroborate the testimony of La'Esha
11  and her mother. The trial court's ruling allowing the prosecution to present the
    testimony of the police witnesses in its case-in-chief rather than in rebuttal was
    neither erroneous nor prejudicial to defendant.
12

13  Exh. F at 8-11 (footnotes omitted).

14      It was on state habeas, in a claim the state high court rejected by one-line denial,

15  that petitioner raised the claim he raises in this Court -- that his *federal due process rights,*

16  *rights guaranteed by the Fourteenth Amendment, were violated by the trial court's decision*

17  *to allow the prosecutor to read his testimony from the first trial into the record when he*

18  *testified at the second trial.* Exhs. J, K.

19      The California Supreme Court's rejection of that claim is not a ruling contrary to or

20  an unreasonable application of clearly established United States Supreme Court

21  precedent. Because it is well settled that federal habeas corpus does not lie for

22  evidentiary errors in state court, *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475, 116

23  L. Ed. 2d 385 (1991), federal habeas relief is available for state trial court evidentiary

24  errors only when the questioned ruling violated federal due process by rendering the trial

25  fundamentally unfair. *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987); *Jeffries v.*

26  *Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993) (citing *Butcher v. Marquez*, 758 F.2d 373, 378

27  (9th Cir. 1985)).

28

1    That did not occur here.  No prejudice could have accrued to petitioner from the

2    introduction of his former testimony because, as petitioner promised, he testified again

3    at the second trial, *and testified to all the matters the jury otherwise learned through the*

4    *introduction of the prior testimony. Compare* Exh. C at 147-84 *with* Exh. C at 229-305.  In

5    other words, introduction of the prior testimony proved cumulative.  And cumulative

6    evidence is not prejudicial evidence.  It is in no way evidence which renders a trial

7    "fundamentally unfair.  Petitioner opines that "the effect" of the introduction of his prior

8    testimony in the People's case-in-chief "was to introduce the irrelevant and prejudicial

9    details of the April 13th battery to portray [him] as a violent individual." Pet. at 4-P.

10   However, petitioner offers no list of "irrelevant and prejudicial" details regarding the April

11   13th battery which the jury learned *only* through the introduction of the former testimony.

12   Petitioner cannot make such a showing and consequently cannot prove prejudice or

13   fundamental unfairness.

14       Petitioner appears to be protesting the introduction of his former testimony in the

15   prosecution's case-in-chief because permitting that introduction in turn permitted the

16   prosecution to introduce "irrelevant and inflammatory" testimony from Officers Larsen

17   and Irwin ostensibly rebutting petitioner's recitation of the April 13th incident. Pet. at

18   4-R. Petitioner, forgets, however, that even without the former testimony the prosecution

19   could have ultimately introduced the testimony of Larsen and Irwin in its rebuttal case

20   because petitioner testified on direct examination *in this case* that he did not assault

21   Woods and La'Esha on April 13.

22       Finally, the state court of appeal detailed, in an objectively reasonable manner, the

23   relevance of petitioner's former testimony.  Exh. F at 8-11.

24       The California Supreme Court's rejection of petitioner's claim that the state trial

25   court violated his due process rights by admission of the "prior testimony" was likewise

26   an objectively reasonable application of precedent such as *Estelle v. McGuire*, 502 U.S.

27

28

1  62, and *Jeffries v. Blodgett*, 5 F.3d 1180.[10]  28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 120

2  S. Ct. at 1521-23.

3

4                          <u>CONCLUSION</u>

5           Accordingly, for all of the foregoing reasons, the State respectfully asks this

6  Court to either dismiss or deny the habeas petition as meritless.

7           Dated:  August 2, 2000.

8                          Respectfully submitted,

9                          BILL LOCKYER
                           Attorney General
10
                           DAVID P. DRULINER
11                         Chief Assistant Attorney General

12                         RONALD A. BASS
                           Senior Assistant Attorney General
13
                           RENÉ A. CHACÓN
14                         Supervising Deputy Attorney General

15

16

17                         BRUCE ORTEGA
                           Deputy Attorney General

18                         Attorneys for Respondent

19  BO:jkh
    00002213SF1999FH0190

20

21

22

23

24

25

26     10.  Ninth Circuit cases may be persuasive authority for purposes of determining
27  whether a particular state court decision is an "unreasonable application" of United States
    Supreme Court law.  *Duhaime v. DuCharme*, 200 F.3d 597, 600 (9th Cir. 2000).
28
    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ANSWER TO THE ORDER TO
    SHOW CAUSE (C 00-20600 JW (PR))
                                       31

## DECLARATION OF SERVICE

Case Name:  LUTHER JONES, JR. v. LARRY SMALL, etc.
            No. C 00-20600 JW (PR)

I declare that:

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On __ August 2, 2000 __, I placed a copy of the attached

> MEMORANDUM OF POINTS AND AUTHORITIES IN
> SUPPORT OF THE ANSWER TO THE ORDER TO SHOW
> CAUSE

in the internal mail collection system at the Office of the Attorney General, 455 Golden Gate Avenue, Suite 11000, San Francisco, California 94102-7004, for deposit in the United States Postal Service that same day in the ordinary course of business, in a sealed envelope, postage fully postpaid, addressed as follows:

LUTHER E. JONES, JR.
B5-118L
Box 44750 60th St. West
Lancaster, CA  93536

I declare under penalty of perjury that the foregoing is true and correct; and that this declaration was executed at San Francisco, California, on __ August 2, 2000 __.

_____          _____
     J. Hum                              (Signature)
   (Typed Name)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **Jones v. Hubbard**
No.: **C 07-04926 JW (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>March 10, 2008</u>, I served the attached **MOTION TO DISMISS SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS DUE TO PETITIONER'S FAILURE TO COMPLY WITH 28 U.S.C. § 2244(b)** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

Luther Jones, Jr.
P-00148
California Medical Facility
P.O. Box 2500
Vacaville, CA 95696-2500

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on March 10, 2008, at San Francisco, California.

|   |   |
|---|---|
| J. Hum | *J Hum* |
| Declarant | Signature |

40227056.wpd